No. 24,117.

CHARLES COONEY, Manager of the Mayetta Indian Baseball Club of Mayetta, *Appellant*, v. LOU HAUCK, Manager of the Valley Falls Baseball Club of Valley Falls, *Appellee*.

SYLLABUS BY THE COURT.

WAGER CONTRACT—*Result of Baseball Game—Unequal Division of Gate Receipts—Unenforceable Contract*. Where the respective owners agree that two ball teams shall play a game at which admission is to be charged, the gate receipts to be divided 60 per cent to the winning and 40 per cent to the losing owner, the transaction amounts to a wager on the result of the game, and the courts will not aid in the enforcement of the contract.

Appeal from Jefferson district court; MARTIN A. BENDER, judge. Opinion filed January 6, 1923. Affirmed.

*A. E. Crane*, of Topeka, *H. T. Phinney*, and *W. O. Worswick*, both of Oskaloosa, for the appellant.

*Henry Casebier*, of Oskaloosa, for the appellee.

*E. D. Woodburn*, of Holton, as *amicus curiæ*.

The opinion of the court was delivered by

MASON, J.: The appeal is taken from the sustaining of a demurrer to the petition.

The petition contained this language: "Plaintiff alleges that he is the manager and owner of the Mayetta Indian Baseball Club of Mayetta, Kansas, and as such owner and manager he makes all contracts for them in his name, and for them, and is authorized to collect all monies due them for playing baseball, and that the defendant Lou Hauck holds a like position with the Valley Falls Baseball Club of Valley Falls, Kansas." It also alleged these facts: The two entered into an oral agreement "that the said clubs

Cooney v. Hauck.

should meet at the baseball park or grounds, at Valley Falls, Kansas, . . . and play a game of baseball according to the rules and regulations of professional baseball, and that the winner of the game should have 60 per cent of the gate receipts or paid admissions to said game, and the loser to have 40 per cent of said gate receipts, or paid admissions to said game, and that in any event the plaintiff was guaranteed that he should receive not less than thirty-five dollars for the game so agreed to be played." The game was played until the ninth inning, when, the score standing 5 to 4 in favor of the visiting team, the umpire called a base runner 'of the home team out, and was immediately compelled to leave the grounds in fear of bodily injury by reason of a demonstration for which an agent of the defendant was responsible. The defendant thereupon declared the game forfeited to his team. The gate receipts amounted to $300, which was paid to the defendant and remains in his hands. The plaintiff sues for the full sum of $180 as the winner's share.

The contract was a wager upon the result of a game. Whether or not it was forbidden by the statute making it a misdemeanor to bet "upon the result of any game of skill or chance, whether with dice or cards or other thing" (Gen. Stat. 1915, § 3632), it was against public policy, and the courts will not lend their aid to its enforcement.

"In most jurisdictions statutes making void all contracts or transactions based on a gambling or wagering consideration now exist. Moreover, as a general rule, the courts of this country, in the more recent decisions, have refused to enforce all wagering contracts, even though they are not declared illegal by statute, holding that wagers of all kinds are inconsistent with the established interests of society, in conflict with the morals of the age, and void as against public policy. For example, in some of the earlier decisions wagers on horse races have been regarded as indifferent wagers on indifferent matters, and therefore not obnoxious to the law. But a wager on a horse race is now very generally held to be void as contravening good morals and public policy. . . .

"Whether or not certain forms of betting or wagering are punishable as criminal offenses depends on the phraseology of the gaming statutes. But though a transaction may not be criminal it may none the less in the eyes of the law be gambling in the sense at least that comes within the condemnation of the civil law, the tendency of which, as has been seen, is to repudiate all wagers of every kind on any subject." (12 R. C. L. 747, 748.)

"At common law, all betting or wagering contracts, which affected injuriously the interests, feelings, or character of third persons, or led to indecent evidence, or were contrary to public policy, or tended to immorality,

or a breach of some law, were held to be void; and such is now the law. Formerly, in England, it was supposed that a great proportion of the wagering contracts were not subject to any of said objections, and were therefore not void, but valid. Such is not the case in this country, and at the present day. Now, as a rule, all betting or wagering contracts are considered as inconsistent with the interests of society, at variance with the laws of morality, against public policy, and therefore void." (*Cleveland v. Wolff*, 7 Kan. 184, 187.)

It is argued in behalf of the plaintiff that the case falls within the rule that competing for a premium offered by others than the competitors is not a betting transaction, but we think the argument unsound. The law on that subject has been thus stated:

"A prize, purse, or premium offered to the successful player in a game or competitor in a contest by persons other than such players or competitors is not a bet or wager. Thus, unless prohibited by statute, racing for a purse, prize, or premium offered by racing or other associations is not gaming. The fact that each player or competitor is required to pay an entrance fee does not make the transaction a bet or a gaming transaction. But when the stake is contributed by the participants alone, and the successful contestant is to have the fund thus created, this does constitute a bet or wager." (27 C. J. 1003.)

Here no prize was offered by a third person. No other person or association arranged with the plaintiff and defendant to provide a ball game as a part of an exhibition including different features. The ball game was the whole thing and it was arranged by the parties hereto. The money that was competed for did, it is true, come from the pockets of those who paid admission fees. But they had nothing to do with the arrangement or management of the affair. They did not offer a prize for the winner of the contest. They merely paid forty cents apiece for the privilege of seeing the game—to be entertained. The gate money belonged (apart from the agreement to divide it in accordance with the result of the game) to the plaintiff and the defendant. They might have made a valid contract for its division in any proportion they saw fit, not dependent upon the result of the game. It was their property and not that of some one else. It had no other claimant after it left the hands of those who paid for their admission. The petition does not allege that the players had any interest in it or were to receive any part of it. If from the allegation that the owners were authorized to make all contracts for the clubs and collect all monies due them, an inference is to be drawn that the gate money was to be divided among them, that would not render the transaction an offer of a prize by one not a party to the contest. Their attitude would be no different

from that of their respective owners, who in their own behalf or as representatives of the players were the "competitors" in the same sense in which that term is applied to those entering horses in a race. If the players are to be regarded as competing for a prize it consisted of money already belonging to them and staked by them on the result of the game. In one of the cases applying the premium rule it was said:

> "If two or more men owning trotting horses should contribute equally or otherwise a sum of money, and put it into the hands of some other person for the purpose of offering it as a premium or reward to them only, and to the owner of the horse who should win the race, such a transaction would undoubtedly come within the rule which prohibits betting on a horse or other race; and it was so held in the case of *Gibbons v. Gouverneur,* supra. (1 Denio, 170.) Where there is no claim that the competitors are the sole contributors to the premium or purse which is offered to them as competitors, we are unable to find any decided case which holds that the competing for such purse or premium is illegal or prohibited." (*Porter v. Day and others,* 71 Wis. 296, 300.)

It might be suggested that the enterprise was organized and conducted by the defendant; that the proceeds were his and that he offered the larger share in them to the winner as an inducement to the plaintiff to compete. We do not regard the language of the petition as open to that construction. The guaranty that the plaintiff, being the owner of the visiting team and subject to certain expenses on that account, should receive at least $35, does not imply that the defendant alone was the proprietor of the exhibition. But if that were the fact it is at least doubtful whether the situation would be so changed as to make the plaintiff's claim enforceable. The money risked on the result of the game would still be that of a participant and not of a third person. In order that a transaction should amount to a bet it has been held not to be necessary that both parties should risk a loss—it being enough that one does. (*Lang v. Merwin,* 99 Maine, 486.)

While the analogy is not close, such a situation would have something in common with that presented where billiards or pool is played with the understanding that the loser shall pay for the use of the table. By the weight of authority such an agreement is regarded as involving a bet upon the result of the game. (Note, 121 A. S. R. 695.)

The conclusion we have reached renders it unnecessary to pass upon other objections which are made to the validity of the contract.

The judgment is affirmed.